1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEANNA GANGSTEE and
     JORDAN CHAMBERS,
11
                    Plaintiffs,              Civ. No. S-10-1004 KJM GGH
12           vs.

13   COUNTY OF SACRAMENTO, et al.,[1]        ORDER

14              Defendants.

15   _____/

16           On September 28, 2011, the court heard argument on the parties' cross-motions

17   for summary judgment/adjudication.  Stewart Katz appeared for the plaintiffs, and Jerri L.

18   Pappone and Amanda Butts appeared for the defendants.

19   /////

20   _____

21           [1]  The caption has been amended to reflect the dismissal of all Doe defendants. Doe
     defendants are disfavored in the Ninth Circuit.  *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th
     Cir. 1980).  Doe defendants may be necessary in situations where the plaintiff has stated a valid
22   claim but needs discovery in order to identify the proper defendant.  *See Wakefield v. Thompson*,
     177 F.3d 1160, 1163 (9th Cir. 1999).  In the instant case, dismissal is warranted because
23   sufficient time has passed with no attempt by plaintiffs to amend the complaint to substitute
     named defendants. *Compare Gillespie*, 629 F.2d at 642, *with Garcia ex rel. Estate of*
24   *Acosta-Garcia*,  2011 WL 1461446, at *1 (9th Cir. Apr. 18, 2011) ("the district court [did not]
     abuse its discretion when it denied [plaintiff] leave to amend the complaint to identify the Doe
25   defendants. [Plaintiff] had ample opportunity prior to the time defendants moved for summary
     judgment to conduct reasonable discovery, identify these defendants, and seek leave to amend
26   the complaint to name them properly.").

                                              1

1    Sacramento County, former Sheriff McGinness and Deputy Sheriff LeCouve have

2    filed a motion for summary judgment on plaintiffs' first, second, third, fourth and sixth claims,

3    as well as plaintiffs' claims for punitive damages.  ECF No. 25.  Plaintiffs concede there is no

4    basis for the sixth claim, negligence, against defendant McGinness.  ECF No. 31.  The first,

5    second, third and fourth claims, respectively, are for unreasonable seizure and excessive force

6    against LeCouve; unconstitutional policies regarding the use of a police canine against

7    McGinness and the County of Sacramento; unconstitutional practices regarding the use of a

8    police canine against McGinness and the County; and inadequate supervision and training

9    against the County and McGinness.  *See* ECF No. 2.

10    Plaintiffs Deanna Gangstee and Jordan Chambers move for summary adjudication

11    on their eighth cause of action, based on California Code of Civil Procedure § 3342, which

12    imposes strict liability on dog owners for bites inflicted by their dogs.  ECF No. 26.[2]

13    Defendants filed a statement of non-opposition, but also "maintain all rights and defenses, and

14    assert that causation, including proximate cause, the nature, extent, and amount of damages,

15    comparative fault, and assumption of the risk, remain contested."  ECF No. 30.

16    For the reasons discussed below the court grants defendants' motion, declines to

17    exercise jurisdiction over the remainder of plaintiffs' claims, and denies plaintiffs' motion.

18    I.  Standards for a Motion for Summary Judgment

19    A court will grant summary judgment "if . . . there is no genuine dispute as to any

20    material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

21    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

22    /////

23    /////

24

25    [2]  The exception for police dogs involved in apprehension of suspects does not apply if
the victim was not involved in the act that prompted use of the dog. CAL. CIV. CODE § 3342(b)

26    & (c).

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[3]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no *genuine* issue of *material* fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

---

[3] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010 amendments.

II.  Facts[4]

On May 18, 2008, Sacramento County Sheriff's Deputies Vitaly Pokopchuk, Erik Bonney and defendant Stephen LeCouve chased a car driven by Elton Ward into the 6000 block of Northcrest Circle in Carmichael.  They stopped Ward's car using a Pursuit Intervention Technique.  ECF No. 32 ¶ 1–3; ECF No. 41-1 at 3:7–11 (Depo. of Vitaly Prokopchuk).  Prokopchuk, Bonney and LeCouve all got out of their cars with their guns drawn and ordered Ward to show his hands.[5]  Ward complied by placing both hands outside of the car window.  ECF No. 41-1 at 3:17–20.

LeCouve, a K-9 officer, brought his dog, Dantes, out of the car.  ECF No. 32 ¶ 6.  LeCouve asserts he did this based on Sheriff's Department protocols to be ready in case a car extraction is required or a suspect flees.  ECF No. 25-5 ¶ 7 (Decl. of Stephen LeCouve).  Plaintiffs allege that the department's policy does not require the officer to bring the dog outside of the car and that such a protocol is not common practice.  ECF No. 35 ¶¶ 10–11 (Decl. of Vanness H. Bogardus III).[6]  While it is undisputed that Dantes was not on a leash, the parties dispute whether LeCouve was holding on to the dog:  LeCouve avers he held Dantes with his left hand, while plaintiffs' witnesses assert LeCouve did not have his hand on Dantes' collar or

---

[4]  The parties object to some of each other's evidence.  The court resolves evidentiary disputes only as to that evidence it deems relevant and material, and does so in its discussion of the facts below.

[5]  The parties dispute which officer reached Ward's car first; however, the court does not find this fact material.

[6]  The court sustains defendants' objections to the Bogardus declaration, ¶ 9 and ¶ 14, lines 18-19 (last sentence): the opinions are conclusory and lack a sufficient basis.  An expert's bare conclusions are inadmissible.  *See Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1318 (9th Cir. 1985) ("[e]xpert opinion is admissible and may defeat summary judgment if it appears the affined is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not").  Although Bogardus lists the materials he examined and describes his expertise, he does not link the materials he reviewed to the conclusions he reached.  *Walton v. U.S. Marshals Service*, 492 F.3d 998, 1008 (9th Cir. 2007) (conclusory expert opinion not admissible).

4

otherwise have Dantes restrained on a leash. *Compare* ECF No. 38 ¶ 4 (Decl. of Phyllis Middletown) *with* ECF No. 25-5 ¶ 7 (LeCouve Decl.). LeCouve told Dantes to "watch," which focuses the dog's attention. ECF No. 41–1 at 60:15–18 (Depo. of Stephen LeCouve). LeCouve says that had he wanted Dantes to apprehend Ward, he would have given the command, "take him." ECF No. 41-1 at 59:18–21.

    Plaintiff Deanna Gangstee and her son, plaintiff Jordan Chambers, lived at 6043 Northcrest Circle, #3. Gangstee and her fiancee Paul Sunburn were cleaning their house while her son played outside. ECF No. 39 ¶ 3 (Decl. of Paul Sunburn); ECF No. 37 ¶¶ 4–5. They heard sirens, and when Gangstee went outside to check on Jordan, she heard officers yelling something about blowing somebody's head off. ECF No. 37 ¶¶ 5–6; ECF No. 39 ¶ 4. Gangstee saw Jordan across the street, signaled him to move to a safer location, and began to run toward him, away from the police. ECF No. 37 ¶¶ 7–8; ECF No. 39 ¶ 5; ECF No. 25-5 ¶ 9; ECF No. 25-4 at 5:20–21 (Depo. of Deanna Gangstee). At that point, Dantes got away from LeCouve and began to chase Gangstee. ECF No. 39 ¶ 8. According to LeCouve, Dantes twisted out of his grip, injuring his finger; he did not report or document the injury, which was minor. ECF No. 25-5 ¶ 9; ECF No. 41-1 at 57:18–23. (LeCouve Depo.). LeCouve ran after Dantes. The parties dispute whether he yelled any commands to the dog before Dantes bit Gangstee. *Compare* ECF No. 25-5 ¶ 10 (stating LeCouve yelled at Dantes to stop) *with* ECF No. 41-1 at 5:2–3 (stating LeCouve yelled "something negative like 'stop' or 'no'"), *and* ECF No. 36 ¶ 8 (Decl. of William Gaines, stating he did not hear LeCouve give any commands until after Dantes had bitten Gangstee).[7]

    Gangstee's neighbor, seeing the dog run after her, yelled at Gangstee to stop running. ECF No. 38 ¶ 5. LeCouve, who was running after Dantes, yelled "don't move" to Gangstee. ECF No. 25-4 at 7:5–15 (Gangstee Depo.). The parties dispute what happened next:

---

[7] The evidence is disputed as to whether Ward was still in the car or handcuffed on the ground at the time Dantes chased Gangstee; the court does not find this issue to be material.

1    Gangstee says she turned, put her arm up to protect herself, and that the dog bit her arm and then

2    her hip, but that she did not hit the dog.  ECF No. 37 ¶ 9; ECF No. 41–1 at 46:20–21; ECF No.

3    39 ¶ 9.  LeCouve says that Dantes bit Gangstee's hip, she hit Dantes, and then Dantes bit her

4    arm.  ECF No. 25-5 ¶ 11; ECF No. 41-1 at 47:5–8.

5           LeCouve said something to the effect of "release" or "stop" and then pulled

6    Dantes off Gangstee, slamming the dog to the ground.  ECF No. 25-5 ¶ 11; ECF No. 25-4 at

7    8:10–12.  He apologized to Gangstee, called an ambulance, put Dantes in the patrol car, and gave

8    Gangstee first aid.  ECF No. 32 ¶¶ 18–19.

9           While Sheriff's Sergeant Donna Cox was Dantes' handler from 2002 through

10   2005, Dantes did not bite any citizen bystanders, though he did bite her.  ECF No. 25-6 ¶ 1; ECF

11   No. 41-1 at 102:21–25.

12          LeCouve first began receiving training as a canine officer in 1991, when he was

13   with the Modesto Police Department, and he has received additional training since joining the

14   Sacramento Sheriff's Department.  ECF No. 25-5 ¶ 18.  LeCouve has not been involved in any

15   other incidents in which Dantes has bitten a citizen bystander.  ECF No. 25-5.  On a separate

16   occasion, however, Dantes bit Deputy Lewis after he jumped in front of Dantes while LeCouve

17   and Dantes were pursuing a burglar.  ECF No. 41-1 at 51:22–25, 52:12.  LeCouve was aware

18   that Dantes had bitten another handler.  ECF No. 41-1 at 52:4–5.  The parties dispute whether

19   Dantes received remedial training after any of his unintended bites.

20          A video camera in LeCouve's car recorded the incident with Gangstee.

21   Lieutenant Michael Butler, a former canine officer who had worked with Dantes in the past,

22   reviewed the tape.  ECF No. 25-7 ¶¶ 1, 8 (Decl. of Michael Butler).  The tape is no longer

23   available.  ECF No. 44-2 ¶ 11.

24          Then-Sheriff McGinness was not directly involved in the call on May 18, 2008.

25   ECF No. 32 ¶ 31.  However, whenever an incident such as the Gangstee bite occurred,

26   Lieutenant Butler would prepare a report, which would go up the chain of command to the

1    Sheriff.  ECF No. 41-1 at 69:4–17 (Butler Depo.).  McGinness also signed out the disc

2    containing the footage from LeCouve's in-car video.  ECF No. 41-1 at 70:2–6.  Staff would

3    discuss such incidents at monthly meetings.  ECF No. 41-1 at 70:14–19.

4            The parties dispute whether, at the time of the incident, Sacramento County had

5    policies in place for canine deployment.  Plaintiffs rely on the deposition of Sergeant Raelene

6    Colly, canine supervisor, who identified as an exhibit a "draft Operations Order that was being

7    completed by Sergeant Mike Butler [but] was never approved."  ECF No. 41-1 at 24:22–24.

8    Colly says the document, identified as "Canine Enforcement Detail Employment Guidelines,"

9    was not in effect in May 2008.  ECF No. 41-1 at 25:16–22.  Later, Colly testified that the only

10   guidelines for dogs at the time Dantes bit Gangstee "are the ones you'd marked 13 and 14,"

11   which she identified as "handler and canine Operations Orders."  ECF No. 41-1 at 29:20–25.

12   Still later, Colly agreed with plaintiffs' counsel that "the policy, as it existed at the time of the

13   incident, places the sole responsibility for the deployment of the dog with the particular handler."

14   ECF No. 41-1 at 31:9–13.

15           According to Lieutenant Butler, the Sacramento Sheriff's Department had several

16   policies for training canines and their handlers, which required that canines and their handlers

17   undergo periodic training and receive yearly evaluations on such topics as "obedience and

18   control of canine" and "control, pursuit, contact, and call off."  ECF No. 25-7 ¶ 6 (Butler Decl.);

19   ECF No. 25-7 at 13–16 (Operations Orders for "Canine Handler Selection and Responsibilities"

20   and "Handler and Canine Training"); ECF No. 41-1.  The deployment guidelines for canines

21   provided that "[t]he decision whether or not to deploy a Sheriff's canine in any given situation

22   shall remain with the handler."  ECF No. 25-7 at 18.  Under that policy, any canine deployed "in

23   any situation . . . must always be under positive/on-lead control of its handler" unless it is used

24   "in a direct apprehension of suspect," in which case it may be used off-lead, but under verbal

25   control of the handler.  ECF No. 25-7 at 19.  One of Dantes' prior handlers said that when an

26   officer used a canine for direct apprehension of a suspect, the officer understood that the dog

7

1   would bite the person it apprehended.  ECF No. 41-1 at 100:8–13 (Decl. of Donna Cox).[8]

2   Plaintiffs' expert avers that "the training actually given the dog in this case was a cause in fact of

3   Gangstee being bitten because of the training's overemphasis on biting and apprehensions."

4   ECF No. 35 ¶ 16.[9]

5   III.  Analysis

6          A.  Seizure

7                Defendants argue that no reasonable fact finder could find for plaintiffs on their

8   claim of unlawful seizure because there was no intentional use of Dantes.  Plaintiffs counter that

9   "[w]hat matters is that the dog was not restrained when it was out of the car."  ECF No. 31 at 8.

10               There is no Fourth Amendment seizure without an intentional act:

11               Violation of the Fourth Amendment requires an intentional
                 acquisition of physical control.  A seizure occurs even when an
12               unintended person or thing is the object of the detention or taking
                 but the detention or taking itself must be willful.  This is implicit in
13               the word "seizure" which can hardly be applied to an unknowing
                 act . . . [A] Fourth Amendment seizure does not occur whenever
14               there is a governmentally caused termination of an individual's
                 freedom of movement . . . nor even whether there is a
15               governmentally *desired* termination of an individual's freedom of
                 movement . . ., but only when there is a governmental termination
16               of freedom of movement *through means intentionally applied*.

17   *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989) (internal citations omitted).  The Court

18   declined to "draw too fine a line," but said "[w]e think it enough for a seizure that a person be

19   stopped by the very instrumentality set in motion or put in place in order to achieve that result."

20   *Id*. at 598–99.

21   /////

22   _____

23          [8]  Defendants object to this portion of the Cox declaration on the grounds that it is not
     relevant and is argumentative.  Although conclusory, the evidence is relevant and not
24   argumentative.  The objection is overruled.

25          [9]  Plaintiffs object to defendants' charts and statistics about "accidental bites" on the
     grounds that the term itself is vague and because the charts on which the declarations are based
26   are not accompanied by any information on how the material was compiled.  This objection is
     well-taken and so is sustained.

1    In cases involving police actions generally, no seizure occurs of an innocent

2 bystander who was not the "intended object" of the seizure. *See, e.g.*, *Claybrook v. Birchwell*,

3 199 F.3d 350, 359 (6th Cir. 2000) (no seizure when a plaintiff was incidentally injured by the

4 application of force by police against a third party, because she was not the "deliberate object of

5 their exertion of force"). Rather, to establish a seizure in the case of a police shooting, a party "

6 must show that (1) [the officer] had the subjective intent to shoot [the party] for the purpose of

7 effecting her seizure, or (2) [the officer] understood when he shot that the bullet would

8 indiscriminately hit anyone in the area ,or (3) [the officer] subjectively intended to seize anyone

9 in the vicinity and was indifferent as to who[m] the bullet actually struck." *Rodriguez v. City of*

10 *Fresno*, ___ F. Supp. 2d ___, 2011 WL 1883195, at *6 (E.D. Cal. May 16, 2011) (parentheticals

11 omitted); *see also Nelson v. City of Davis*, 709 F. Supp. 2d 978, 987 (E.D. Cal. 2010) (agreeing

12 that in certain situations innocent bystanders can be seized by application of force when police

13 action is intentional but indiscriminate; denying summary judgment for city because plaintiff

14 "was in a group intentionally targeted" by police-use of pepper spray launchers). To reach a

15 finding that no seizure has occurred, "the critical point is that [the officer's] intent was focused

16 on [someone else], not on [the complaining party]. *Id.*

17    Police-dog cases, though, require a special breed of analysis. Once deployed, a

18 police-dog is generally unable to discriminate between suspects and innocent parties and is

19 generally trained to bite whomever it encounters, facts suggesting the officer's intention to seize

20 whomever the dog ultimately does encounter. *See Vathekan v. Prince George's Cnty.*, 154 F.3d

21 173, 178–79 (4th Cir. 1998) (plaintiff was seized when she was bitten by police-dog after officer

22 released the dog to search plaintiff's home for possible burglary suspect); *Garcia v. City of*

23 *Sacramento*, 2010 WL 3521954, at *2 (E.D. Cal. 2010) (though police-dog attacked the wrong

24 person, officer's intentional use of the dog to search for and subdue a suspect was sufficient to

25 find a seizure).

26 /////

1    The court's threshold determination, then, is whether, there was intentional police

2    action in this case to support a finding that there was a seizure.  *Brower*, 489 U.S. at 596–97;

3    *Troublefield v. City of Harrisburg*, 789 F. Supp. 160, 166 (M.D. Pa. 1992) (where "[the plaintiff]

4    was injured by a bullet fired by accident, no [F]ourth [A]mendment rights have been trampled

5    upon because [the officer] did not intend the bullet to bring plaintiff within his control").  Here,

6    the parties dispute whether LeCouve intentionally deployed Dantes.  Thus, the court must

7    determine if a reasonable jury could find that LeCouve committed an intentional act to achieve a

8    seizure.  *See Brower,* 489 U.S. at 598–99 ("a seizure [can be found when] a person [is] stopped

9    by the very instrumentality set in motion or put in place in order to achieve that result").

10   Because there is no guidance at this point from the Ninth Circuit, case law from other circuits

11   provides some help in answering this question.[10]

12   Defendants rely on *Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2005).[11]  In

13   *Dunigan*, a leashed police-dog named Kojak and its handler were part of a group that entered the

14   plaintiff's home to search for her son, a parolee at large.  *Id*. at 489.  At some point, another

15   officer pushed the plaintiff, who was on a narrow stairway leading to the basement where the

16   officers had seen movement.  *Id*.  The plaintiff stumbled into the dog's defensive perimeter and

17   the dog bit her.  *Id*. at 489–90.  The Sixth Circuit upheld the district court's determination that

18   the officers were entitled to qualified immunity.  *Id*. at 495.  It reasoned that the dog's presence

19   was appropriate because it was trained to "track" and police believed the parolee might attempt

20   to flee.  *Id*. at 492.  The canine officer had not instructed the dog to bite the plaintiff and was not

21   responsible for the contact that caused the plaintiff to stumble into the dog's defensive area.  *Id*.

22

23   _____

     [10]  Citable Ninth Circuit law on bites from police dogs generally involves the use of
24   police dogs against suspects.  *See Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994); *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998).

25   [11]  Defendants also cite unpublished Ninth Circuit authority decided before that court's
26   rules allowed for citation.  The court does not consider this authority in resolving the issues in this case.

1    It noted that the dog had not bitten another of the plaintiff's sons who had passed the dog on the

2    stairs, "giv[ing] rise to the reasonable inference that [the canine officer] was exercising control

3    over Kojak." *Id*. at 493.  "As a result, a reasonable jury could only conclude Kojak's actions

4    were a spontaneous response to Plaintiff's 'threatening' movement . . . ." *Id*.  Plaintiffs argue

5    that *Dunigan* is distinguishable because in this case Gangstee was moving out of harm's way

6    when Dantes pursued and then bit her.  In *Dunigan*, in contrast, if not for plaintiff's stumbling

7    into the dog, the incident would not have likely occurred.  *Id*. at 493.[12]

8           The Sixth Circuit also has rejected a seizure claim in the case of *Neal v. Melton*,

9    2011 WL 2559003 (6th Cir. June 28, 2011), in which the police used a dog to sniff around a car

10   stopped for a traffic violation and then put the dog back in the patrol car.  *Id*. at *1.  While the

11   deputies were involved elsewhere, the dog got out of the police car and jumped into the stopped

12   car, scratching a child restrained in the back seat in a child safety seat.  *Id*. at **1-2.  The

13   passenger sued, alleging excessive force.  *Id*.  The court rejected the plaintiff's claim of unlawful

14   seizure, noting that while the officers' negligence allowed the dog to come into contact with

15   plaintiff, there was not the kind of intentional or knowing contact sufficient to implicate the

16   Fourth Amendment.  *Id*. at *5.

17          The Fourth Circuit, in *Melgar v. Greene*, 593 F.3d 348 (4th Cir. 2010),

18   considered the case of a police-dog named Carter, deployed to search for an intoxicated teen on a

19   cold night, that bit the teenager.  That court determined that because the officer used the dog to

20   find the boy, the boy was seized by the instrumentality set in motion to achieve that result; "[t]he

21   fact that the seizure did not occur in quite the manner Officer Greene had envisioned does not

22   /////

23   _____

24   [12]  Plaintiffs argue that this case should be analogized to "an organized political protest,
     demonstration or rally where law-abiding bystanders are arrested or beaten" or "a false arrest
25   situation."  ECF No. 31 at 7:20–28.  Each of these arguments is inapplicable to the intentional
     act analysis, because each describes situations where the officer's intentional conduct is
26   indisputable.  They are more properly applicable to the determination of whether Gangstee was
     the "intended object."

1  change this fact, especially since Carter was trained to bite any individual he found when

2  tracking." *Id*. at 354.

3          As noted, plaintiffs in this case argue that "[w]hat matters is that the dog was not

4  restrained when it was out of the car." ECF No. 31 at 8.  In essence, they argue that by

5  intentionally taking Dantes out of the car without his leash, LeCouve committed an act sufficient

6  to intentionally deploy Dantes.

7          One district court also has considered a case somewhat analogous to this one.  In

8  *Dennen v. City of Duluth*, 2002 WL 832593 (D. Minn. May 1, 2002),[13] the court in deciding a

9  civil rights action alleging excessive force, held that the plaintiff was not seized when an officer

10  and his police-dog followed the plaintiff and plaintiff's contact with the dog caused him to fall

11  down a ravine, severely injuring him.  *Id*. at *1.  In that case, the officer had seen the plaintiff

12  walking down the street, appearing to conceal something.  *Id*.  The officer made a U-turn and

13  plaintiff ran in the other direction.  *Id*.  The officer got out of his patrol car with his canine

14  partner, Citus, and began to look for plaintiff; Citus was not on his leash.  *Id*.  After a few

15  moments, Citus appeared to have picked up a human scent.  *Id*. at *2.  As Citus followed the

16  scent and got some distance ahead, the officer called for his return, just as Citus entered the edge

17  of a wooded area.  *Id*.  The dog returned and the officer put him on his leash.  *Id*.  Hearing

18  sounds coming from the wooded area, the officer announced he had his police-dog with him and

19  ordered the person in the woods to come out.  *Id*.  A loud crash followed.  Upon inspection,

20  plaintiff was found at the bottom of a ravine, lying in the water and severely injured.  *Id*.

21          Plaintiff, who claimed he had no memory of the event, argued that merely

22  "allowing Citus to exit the patrol car without a leash constitutes a 'deployment' of the dog."  *Id*.

23  at *5.  The court found no evidence to support the inference that the officer intended to deploy

24

25          [13] "When a case is unreported but available on a widely used electronic database, it may
be cited to that database."  THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 10.8.1, at 104

26  (Columbia Law Review Ass'n et al. eds., 19th ed. 2010).

1   Citus. *Id*. at *5.  The officer testified he brought Citus with him for protection and not to track or

2   apprehend plaintiff. *Id*.  And despite the fact that Citus was running ahead and may have even

3   come into contact with plaintiff, Peterson quickly called for Citus to return and put him on his

4   leash. *Id*. at *5–6.  Because no other material facts reasonably implied that the officer intended

5   to deploy Citus to apprehend someone in the wooded area, there was no seizure. *Id*.

6            As in *Dennen*, in this case LeCouve brought Dantes out of his vehicle without a

7   leash.  Even if the absence of a leash violated departmental policy, as plaintiffs argue, the

8   violation by itself does not support a reasonable inference that LeCouve intentionally deployed

9   Dantes to effect a seizure.  The additional facts of Dantes' running past Ward, the suspect, and

10  the possible delay in LeCouve's yelling for the dog to stop do not support such a conclusion

11  either.

12           Gangstee's own witnesses declare that LeCouve did not give any commands to

13  Dantes prior to his running after her; this fact undermines an inference of intentional

14  deployment.  Without some other affirmative act by LeCouve, the court is left to guesswork,

15  insufficient to support a reasonable inference. *See Neely v. St. Paul Fire & Marine Ins. Co.*, 584

16  F.2d 341, 346 (9th Cir. 1978) (affirming grant of summary judgment for defendants where

17  plaintiff's evidence, while "possibly" supporting a causation finding, could not support an

18  inference in his favor because "[t]he verdict of a jury cannot rest on guess or speculation.").

19           On the record before the court, plaintiffs' Fourth Amendment claim cannot

20  survive summary judgment.

21       B.  Excessive Force, Monell Liability, and Inadequate Supervision

22           Plaintiffs' claims of excessive force, unconstitutional policies and procedures, and

23  inadequate supervision all are premised on a violation of a constitutional right, relying upon a

24  showing that Gangstee was seized to support the claims. *See* ECF No. 31 at 8.  Because a

25  reasonable fact-finder could not find an unlawful seizure, these other claims also cannot survive

26  summary judgment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (no

1   constitutional violation can be found if there was no seizure); *cf. Monell v. New York City Dept.*

2   *of Soc. Servs.*, 436 U.S. 658, 690 (1978) (governmental body could be liable for policies and

3   procedures found to be responsible for an underlying constitutional violation by an employee);

4   *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979) (supervisory personnel can be liable under

5   § 1983 for the actions of their employees when a causal link between the supervisor and the

6   claimed constitutional violation can be shown).

7            The court will GRANT defendants' motion for summary adjudication of claims

8   one, two, three and four.

9   IV.    Remaining State Law Claims

10            Subject to the conditions set forth in 28 U.S.C. § 1367(c), a district court may

11   decline to exercise supplemental jurisdiction over state law claims. *See Acri v. Varian*

12   *Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc).  The court's decision whether to

13   exercise supplemental jurisdiction should be informed by values of "economy, convenience,

14   fairness, and comity." *Id.* at 1001 (citations omitted).  Primary responsibility for developing and

15   applying state law rests with the state courts.  Therefore, when federal claims are eliminated

16   before trial, district courts should usually decline to exercise supplemental jurisdiction.  *See*

17   *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Gini v. Las Vegas Metro. Police*

18   *Dept.*, 40 F.3d 1041, 1046 (9th Cir. 1994) ("[I]n the usual case in which federal-law claims are

19   eliminated before trial, the balance of factors . . . will point toward declining to exercise

20   jurisdiction over the remaining state law claims.") (quoting *Schneider v. TRW Inc.*, 938 F.2d 986,

21   993 (9th Cir. 1991)).  Although this case has been pending in this court for going on two years,

22   the state law claims, with the exception of the eighth cause of action, have not been briefed or

23   argued in this court.  Sending the case to the state court, more familiar with the remaining

24   claims, will promote judicial economy.  In accordance with 28 U.S.C. § 1367(c), this court

25   declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.

26   Accordingly, plaintiffs' claims five, six, seven and eight will be DISMISSED without prejudice.

1  V.      Plaintiffs' Motion for Summary Judgment

2          The court having declined to exercise jurisdiction over the remaining state law

3  claims, plaintiffs' motion for summary judgment of their eighth cause of action for a violation of

4  California Civil Code §3342 is DENIED without prejudice.

5          IT IS HEREBY ORDERED that:

6          1.      Defendants' August 26, 2011, motion for summary judgment with respect

7                  to Plaintiffs' claims 1–4 (ECF No. 25) is GRANTED;

8          2.      Plaintiffs' remaining claims 5–8 are DISMISSED without prejudice; and

9          3.      Plaintiffs' August 31, 2011, motion for summary judgment (ECF No. 26)

10                 is DENIED without prejudice.

11         IT IS SO ORDERED.

12 DATED:  January 11, 2012.

13

14                                                  _____

15                                                  UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26