IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEANNA GANGSTEE and
JORDAN CHAMBERS,

      Plaintiffs,                         Civ. No. S-10-1004 KJM GGH

  vs.

COUNTY OF SACRAMENTO, et al.,[1]       ORDER

      Defendants.

_____/

On September 28, 2011, the court heard argument on the parties' cross-motions for summary judgment/adjudication. Stewart Katz appeared for the plaintiffs, and Jerri L. Pappone and Amanda Butts appeared for the defendants.

/////

---

[1] The caption has been amended to reflect the dismissal of all Doe defendants. Doe defendants are disfavored in the Ninth Circuit. *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). Doe defendants may be necessary in situations where the plaintiff has stated a valid claim but needs discovery in order to identify the proper defendant. *See Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999). In the instant case, dismissal is warranted because sufficient time has passed with no attempt by plaintiffs to amend the complaint to substitute named defendants. *Compare Gillespie*, 629 F.2d at 642, *with Garcia ex rel. Estate of Acosta-Garcia*, 2011 WL 1461446, at *1 (9th Cir. Apr. 18, 2011) ("the district court [did not] abuse its discretion when it denied [plaintiff] leave to amend the complaint to identify the Doe defendants. [Plaintiff] had ample opportunity prior to the time defendants moved for summary judgment to conduct reasonable discovery, identify these defendants, and seek leave to amend the complaint to name them properly.").

1

Sacramento County, former Sheriff McGinness and Deputy Sheriff LeCouve have filed a motion for summary judgment on plaintiffs' first, second, third, fourth and sixth claims, as well as plaintiffs' claims for punitive damages. ECF No. 25. Plaintiffs concede there is no basis for the sixth claim, negligence, against defendant McGinness. ECF No. 31. The first, second, third and fourth claims, respectively, are for unreasonable seizure and excessive force against LeCouve; unconstitutional policies regarding the use of a police canine against McGinness and the County of Sacramento; unconstitutional practices regarding the use of a police canine against McGinness and the County; and inadequate supervision and training against the County and McGinness. *See* ECF No. 2.

Plaintiffs Deanna Gangstee and Jordan Chambers move for summary adjudication on their eighth cause of action, based on California Code of Civil Procedure § 3342, which imposes strict liability on dog owners for bites inflicted by their dogs. ECF No. 26.[2] Defendants filed a statement of non-opposition, but also "maintain all rights and defenses, and assert that causation, including proximate cause, the nature, extent, and amount of damages, comparative fault, and assumption of the risk, remain contested." ECF No. 30.

For the reasons discussed below the court grants defendants' motion, declines to exercise jurisdiction over the remainder of plaintiffs' claims, and denies plaintiffs' motion.

I. Standards for a Motion for Summary Judgment

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

/////

/////

---

[2] The exception for police dogs involved in apprehension of suspects does not apply if the victim was not involved in the act that prompted use of the dog. CAL. CIV. CODE § 3342(b) & (c).

2

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[3]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no *genuine* issue of *material* fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

---

[3] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010 amendments.

II. Facts[4]

On May 18, 2008, Sacramento County Sheriff's Deputies Vitaly Pokopchuk, Erik Bonney and defendant Stephen LeCouve chased a car driven by Elton Ward into the 6000 block of Northcrest Circle in Carmichael. They stopped Ward's car using a Pursuit Intervention Technique. ECF No. 32 ¶ 1–3; ECF No. 41-1 at 3:7–11 (Depo. of Vitaly Prokopchuk). Prokopchuk, Bonney and LeCouve all got out of their cars with their guns drawn and ordered Ward to show his hands.[5] Ward complied by placing both hands outside of the car window. ECF No. 41-1 at 3:17–20.

LeCouve, a K-9 officer, brought his dog, Dantes, out of the car. ECF No. 32 ¶ 6. LeCouve asserts he did this based on Sheriff's Department protocols to be ready in case a car extraction is required or a suspect flees. ECF No. 25-5 ¶ 7 (Decl. of Stephen LeCouve). Plaintiffs allege that the department's policy does not require the officer to bring the dog outside of the car and that such a protocol is not common practice. ECF No. 35 ¶¶ 10–11 (Decl. of Vanness H. Bogardus III).[6] While it is undisputed that Dantes was not on a leash, the parties dispute whether LeCouve was holding on to the dog: LeCouve avers he held Dantes with his left hand, while plaintiffs' witnesses assert LeCouve did not have his hand on Dantes' collar or

---

[4] The parties object to some of each other's evidence. The court resolves evidentiary disputes only as to that evidence it deems relevant and material, and does so in its discussion of the facts below.

[5] The parties dispute which officer reached Ward's car first; however, the court does not find this fact material.

[6] The court sustains defendants' objections to the Bogardus declaration, ¶ 9 and ¶ 14, lines 18-19 (last sentence): the opinions are conclusory and lack a sufficient basis. An expert's bare conclusions are inadmissible. *See Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1318 (9th Cir. 1985) ("[e]xpert opinion is admissible and may defeat summary judgment if it appears the affined is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not"). Although Bogardus lists the materials he examined and describes his expertise, he does not link the materials he reviewed to the conclusions he reached. *Walton v. U.S. Marshals Service*, 492 F.3d 998, 1008 (9th Cir. 2007) (conclusory expert opinion not admissible).

otherwise have Dantes restrained on a leash. *Compare* ECF No. 38 ¶ 4 (Decl. of Phyllis Middletown) *with* ECF No. 25-5 ¶ 7 (LeCouve Decl.). LeCouve told Dantes to "watch," which focuses the dog's attention. ECF No. 41–1 at 60:15–18 (Depo. of Stephen LeCouve). LeCouve says that had he wanted Dantes to apprehend Ward, he would have given the command, "take him." ECF No. 41-1 at 59:18–21.

    Plaintiff Deanna Gangstee and her son, plaintiff Jordan Chambers, lived at 6043 Northcrest Circle, #3. Gangstee and her fiancee Paul Sunburn were cleaning their house while her son played outside. ECF No. 39 ¶ 3 (Decl. of Paul Sunburn); ECF No. 37 ¶¶ 4–5. They heard sirens, and when Gangstee went outside to check on Jordan, she heard officers yelling something about blowing somebody's head off. ECF No. 37 ¶¶ 5–6; ECF No. 39 ¶ 4. Gangstee saw Jordan across the street, signaled him to move to a safer location, and began to run toward him, away from the police. ECF No. 37 ¶¶ 7–8; ECF No. 39 ¶ 5; ECF No. 25-5 ¶ 9; ECF No. 25-4 at 5:20–21 (Depo. of Deanna Gangstee). At that point, Dantes got away from LeCouve and began to chase Gangstee. ECF No. 39 ¶ 8. According to LeCouve, Dantes twisted out of his grip, injuring his finger; he did not report or document the injury, which was minor. ECF No. 25-5 ¶ 9; ECF No. 41-1 at 57:18–23. (LeCouve Depo.). LeCouve ran after Dantes. The parties dispute whether he yelled any commands to the dog before Dantes bit Gangstee. *Compare* ECF No. 25-5 ¶ 10 (stating LeCouve yelled at Dantes to stop) *with* ECF No. 41-1 at 5:2–3 (stating LeCouve yelled "something negative like 'stop' or 'no'"), *and* ECF No. 36 ¶ 8 (Decl. of William Gaines, stating he did not hear LeCouve give any commands until after Dantes had bitten Gangstee).[7]

    Gangstee's neighbor, seeing the dog run after her, yelled at Gangstee to stop running. ECF No. 38 ¶ 5. LeCouve, who was running after Dantes, yelled "don't move" to Gangstee. ECF No. 25-4 at 7:5–15 (Gangstee Depo.). The parties dispute what happened next:

---

[7] The evidence is disputed as to whether Ward was still in the car or handcuffed on the ground at the time Dantes chased Gangstee; the court does not find this issue to be material.

5

1  Gangstee says she turned, put her arm up to protect herself, and that the dog bit her arm and then
2  her hip, but that she did not hit the dog.  ECF No. 37 ¶ 9; ECF No. 41–1 at 46:20–21; ECF No.
3  39 ¶ 9.  LeCouve says that Dantes bit Gangstee's hip, she hit Dantes, and then Dantes bit her
4  arm.  ECF No. 25-5 ¶ 11; ECF No. 41-1 at 47:5–8.
5          LeCouve said something to the effect of "release" or "stop" and then pulled
6  Dantes off Gangstee, slamming the dog to the ground.  ECF No. 25-5 ¶ 11; ECF No. 25-4 at
7  8:10–12.  He apologized to Gangstee, called an ambulance, put Dantes in the patrol car, and gave
8  Gangstee first aid.  ECF No. 32 ¶¶ 18–19.
9          While Sheriff's Sergeant Donna Cox was Dantes' handler from 2002 through
10 2005, Dantes did not bite any citizen bystanders, though he did bite her.  ECF No. 25-6 ¶ 1; ECF
11 No. 41-1 at 102:21–25.
12         LeCouve first began receiving training as a canine officer in 1991, when he was
13 with the Modesto Police Department, and he has received additional training since joining the
14 Sacramento Sheriff's Department.  ECF No. 25-5 ¶ 18.  LeCouve has not been involved in any
15 other incidents in which Dantes has bitten a citizen bystander.  ECF No. 25-5.  On a separate
16 occasion, however, Dantes bit Deputy Lewis after he jumped in front of Dantes while LeCouve
17 and Dantes were pursuing a burglar.  ECF No. 41-1 at 51:22–25, 52:12.  LeCouve was aware
18 that Dantes had bitten another handler.  ECF No. 41-1 at 52:4–5.  The parties dispute whether
19 Dantes received remedial training after any of his unintended bites.
20         A video camera in LeCouve's car recorded the incident with Gangstee.
21 Lieutenant Michael Butler, a former canine officer who had worked with Dantes in the past,
22 reviewed the tape.  ECF No. 25-7 ¶¶ 1, 8 (Decl. of Michael Butler).  The tape is no longer
23 available.  ECF No. 44-2 ¶ 11.
24         Then-Sheriff McGinness was not directly involved in the call on May 18, 2008.
25 ECF No. 32 ¶ 31.  However, whenever an incident such as the Gangstee bite occurred,
26 Lieutenant Butler would prepare a report, which would go up the chain of command to the

1 Sheriff.  ECF No. 41-1 at 69:4–17 (Butler Depo.).  McGinness also signed out the disc
2 containing the footage from LeCouve's in-car video.  ECF No. 41-1 at 70:2–6.  Staff would
3 discuss such incidents at monthly meetings.  ECF No. 41-1 at 70:14–19.

4         The parties dispute whether, at the time of the incident, Sacramento County had
5 policies in place for canine deployment.  Plaintiffs rely on the deposition of Sergeant Raelene
6 Colly, canine supervisor, who identified as an exhibit a "draft Operations Order that was being
7 completed by Sergeant Mike Butler [but] was never approved."  ECF No. 41-1 at 24:22–24.
8 Colly says the document, identified as "Canine Enforcement Detail Employment Guidelines,"
9 was not in effect in May 2008.  ECF No. 41-1 at 25:16–22.  Later, Colly testified that the only
10 guidelines for dogs at the time Dantes bit Gangstee "are the ones you'd marked 13 and 14,"
11 which she identified as "handler and canine Operations Orders."  ECF No. 41-1 at 29:20–25.
12 Still later, Colly agreed with plaintiffs' counsel that "the policy, as it existed at the time of the
13 incident, places the sole responsibility for the deployment of the dog with the particular handler."
14 ECF No. 41-1 at 31:9–13.

15         According to Lieutenant Butler, the Sacramento Sheriff's Department had several
16 policies for training canines and their handlers, which required that canines and their handlers
17 undergo periodic training and receive yearly evaluations on such topics as "obedience and
18 control of canine" and "control, pursuit, contact, and call off."  ECF No. 25-7 ¶ 6 (Butler Decl.);
19 ECF No. 25-7 at 13–16 (Operations Orders for "Canine Handler Selection and Responsibilities"
20 and "Handler and Canine Training"); ECF No. 41-1.  The deployment guidelines for canines
21 provided that "[t]he decision whether or not to deploy a Sheriff's canine in any given situation
22 shall remain with the handler."  ECF No. 25-7 at 18.  Under that policy, any canine deployed "in
23 any situation . . . must always be under positive/on-lead control of its handler" unless it is used
24 "in a direct apprehension of suspect," in which case it may be used off-lead, but under verbal
25 control of the handler.  ECF No. 25-7 at 19.  One of Dantes' prior handlers said that when an
26 officer used a canine for direct apprehension of a suspect, the officer understood that the dog

7

would bite the person it apprehended. ECF No. 41-1 at 100:8–13 (Decl. of Donna Cox).[8] Plaintiffs' expert avers that "the training actually given the dog in this case was a cause in fact of Gangstee being bitten because of the training's overemphasis on biting and apprehensions." ECF No. 35 ¶ 16.[9]

III. Analysis

    A. Seizure

Defendants argue that no reasonable fact finder could find for plaintiffs on their claim of unlawful seizure because there was no intentional use of Dantes. Plaintiffs counter that "[w]hat matters is that the dog was not restrained when it was out of the car." ECF No. 31 at 8.

There is no Fourth Amendment seizure without an intentional act:

> Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking but the detention or taking itself must be willful. This is implicit in the word "seizure" which can hardly be applied to an unknowing act . . . [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . . nor even whether there is a governmentally *desired* termination of an individual's freedom of movement . . ., but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989) (internal citations omitted). The Court declined to "draw too fine a line," but said "[w]e think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 598–99.

/////

---

[8] Defendants object to this portion of the Cox declaration on the grounds that it is not relevant and is argumentative. Although conclusory, the evidence is relevant and not argumentative. The objection is overruled.

[9] Plaintiffs object to defendants' charts and statistics about "accidental bites" on the grounds that the term itself is vague and because the charts on which the declarations are based are not accompanied by any information on how the material was compiled. This objection is well-taken and so is sustained.

In cases involving police actions generally, no seizure occurs of an innocent bystander who was not the "intended object" of the seizure. *See, e.g.*, *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (no seizure when a plaintiff was incidentally injured by the application of force by police against a third party, because she was not the "deliberate object of their exertion of force"). Rather, to establish a seizure in the case of a police shooting, a party " must show that (1) [the officer] had the subjective intent to shoot [the party] for the purpose of effecting her seizure, or (2) [the officer] understood when he shot that the bullet would indiscriminately hit anyone in the area ,or (3) [the officer] subjectively intended to seize anyone in the vicinity and was indifferent as to who[m] the bullet actually struck." *Rodriguez v. City of Fresno*, ___ F. Supp. 2d ___, 2011 WL 1883195, at *6 (E.D. Cal. May 16, 2011) (parentheticals omitted); *see also Nelson v. City of Davis*, 709 F. Supp. 2d 978, 987 (E.D. Cal. 2010) (agreeing that in certain situations innocent bystanders can be seized by application of force when police action is intentional but indiscriminate; denying summary judgment for city because plaintiff "was in a group intentionally targeted" by police-use of pepper spray launchers). To reach a finding that no seizure has occurred, "the critical point is that [the officer's] intent was focused on [someone else], not on [the complaining party]. *Id.*

Police-dog cases, though, require a special breed of analysis. Once deployed, a police-dog is generally unable to discriminate between suspects and innocent parties and is generally trained to bite whomever it encounters, facts suggesting the officer's intention to seize whomever the dog ultimately does encounter. *See Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 178–79 (4th Cir. 1998) (plaintiff was seized when she was bitten by police-dog after officer released the dog to search plaintiff's home for possible burglary suspect); *Garcia v. City of Sacramento*, 2010 WL 3521954, at *2 (E.D. Cal. 2010) (though police-dog attacked the wrong person, officer's intentional use of the dog to search for and subdue a suspect was sufficient to find a seizure).

/////

The court's threshold determination, then, is whether, there was intentional police action in this case to support a finding that there was a seizure. *Brower*, 489 U.S. at 596–97; *Troublefield v. City of Harrisburg*, 789 F. Supp. 160, 166 (M.D. Pa. 1992) (where "[the plaintiff] was injured by a bullet fired by accident, no [F]ourth [A]mendment rights have been trampled upon because [the officer] did not intend the bullet to bring plaintiff within his control"). Here, the parties dispute whether LeCouve intentionally deployed Dantes. Thus, the court must determine if a reasonable jury could find that LeCouve committed an intentional act to achieve a seizure. *See Brower,* 489 U.S. at 598–99 ("a seizure [can be found when] a person [is] stopped by the very instrumentality set in motion or put in place in order to achieve that result"). Because there is no guidance at this point from the Ninth Circuit, case law from other circuits provides some help in answering this question.[10]

Defendants rely on *Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2005).[11] In *Dunigan*, a leashed police-dog named Kojak and its handler were part of a group that entered the plaintiff's home to search for her son, a parolee at large. *Id*. at 489. At some point, another officer pushed the plaintiff, who was on a narrow stairway leading to the basement where the officers had seen movement. *Id*. The plaintiff stumbled into the dog's defensive perimeter and the dog bit her. *Id*. at 489–90. The Sixth Circuit upheld the district court's determination that the officers were entitled to qualified immunity. *Id*. at 495. It reasoned that the dog's presence was appropriate because it was trained to "track" and police believed the parolee might attempt to flee. *Id*. at 492. The canine officer had not instructed the dog to bite the plaintiff and was not responsible for the contact that caused the plaintiff to stumble into the dog's defensive area. *Id*.

---

[10] Citable Ninth Circuit law on bites from police dogs generally involves the use of police dogs against suspects. *See Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994); *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998).

[11] Defendants also cite unpublished Ninth Circuit authority decided before that court's rules allowed for citation. The court does not consider this authority in resolving the issues in this case.

10

It noted that the dog had not bitten another of the plaintiff's sons who had passed the dog on the stairs, "giv[ing] rise to the reasonable inference that [the canine officer] was exercising control over Kojak." *Id*. at 493. "As a result, a reasonable jury could only conclude Kojak's actions were a spontaneous response to Plaintiff's 'threatening' movement . . . ." *Id*. Plaintiffs argue that *Dunigan* is distinguishable because in this case Gangstee was moving out of harm's way when Dantes pursued and then bit her. In *Dunigan*, in contrast, if not for plaintiff's stumbling into the dog, the incident would not have likely occurred. *Id*. at 493.[12]

The Sixth Circuit also has rejected a seizure claim in the case of *Neal v. Melton*, 2011 WL 2559003 (6th Cir. June 28, 2011), in which the police used a dog to sniff around a car stopped for a traffic violation and then put the dog back in the patrol car. *Id*. at *1. While the deputies were involved elsewhere, the dog got out of the police car and jumped into the stopped car, scratching a child restrained in the back seat in a child safety seat. *Id*. at **1-2. The passenger sued, alleging excessive force. *Id*. The court rejected the plaintiff's claim of unlawful seizure, noting that while the officers' negligence allowed the dog to come into contact with plaintiff, there was not the kind of intentional or knowing contact sufficient to implicate the Fourth Amendment. *Id*. at *5.

The Fourth Circuit, in *Melgar v. Greene*, 593 F.3d 348 (4th Cir. 2010), considered the case of a police-dog named Carter, deployed to search for an intoxicated teen on a cold night, that bit the teenager. That court determined that because the officer used the dog to find the boy, the boy was seized by the instrumentality set in motion to achieve that result; "[t]he fact that the seizure did not occur in quite the manner Officer Greene had envisioned does not

/////

---

[12] Plaintiffs argue that this case should be analogized to "an organized political protest, demonstration or rally where law-abiding bystanders are arrested or beaten" or "a false arrest situation." ECF No. 31 at 7:20–28. Each of these arguments is inapplicable to the intentional act analysis, because each describes situations where the officer's intentional conduct is indisputable. They are more properly applicable to the determination of whether Gangstee was the "intended object."

11

change this fact, especially since Carter was trained to bite any individual he found when tracking." *Id*. at 354.

As noted, plaintiffs in this case argue that "[w]hat matters is that the dog was not restrained when it was out of the car." ECF No. 31 at 8. In essence, they argue that by intentionally taking Dantes out of the car without his leash, LeCouve committed an act sufficient to intentionally deploy Dantes.

One district court also has considered a case somewhat analogous to this one. In *Dennen v. City of Duluth*, 2002 WL 832593 (D. Minn. May 1, 2002),[13] the court in deciding a civil rights action alleging excessive force, held that the plaintiff was not seized when an officer and his police-dog followed the plaintiff and plaintiff's contact with the dog caused him to fall down a ravine, severely injuring him. *Id*. at *1. In that case, the officer had seen the plaintiff walking down the street, appearing to conceal something. *Id*. The officer made a U-turn and plaintiff ran in the other direction. *Id*. The officer got out of his patrol car with his canine partner, Citus, and began to look for plaintiff; Citus was not on his leash. *Id*. After a few moments, Citus appeared to have picked up a human scent. *Id*. at *2. As Citus followed the scent and got some distance ahead, the officer called for his return, just as Citus entered the edge of a wooded area. *Id*. The dog returned and the officer put him on his leash. *Id*. Hearing sounds coming from the wooded area, the officer announced he had his police-dog with him and ordered the person in the woods to come out. *Id*. A loud crash followed. Upon inspection, plaintiff was found at the bottom of a ravine, lying in the water and severely injured. *Id*.

Plaintiff, who claimed he had no memory of the event, argued that merely "allowing Citus to exit the patrol car without a leash constitutes a 'deployment' of the dog." *Id*. at *5. The court found no evidence to support the inference that the officer intended to deploy

---

[13] "When a case is unreported but available on a widely used electronic database, it may be cited to that database." THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 10.8.1, at 104 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010).

12

Citus. *Id*. at *5. The officer testified he brought Citus with him for protection and not to track or apprehend plaintiff. *Id*. And despite the fact that Citus was running ahead and may have even come into contact with plaintiff, Peterson quickly called for Citus to return and put him on his leash. *Id*. at *5–6. Because no other material facts reasonably implied that the officer intended to deploy Citus to apprehend someone in the wooded area, there was no seizure. *Id*.

As in *Dennen*, in this case LeCouve brought Dantes out of his vehicle without a leash. Even if the absence of a leash violated departmental policy, as plaintiffs argue, the violation by itself does not support a reasonable inference that LeCouve intentionally deployed Dantes to effect a seizure. The additional facts of Dantes' running past Ward, the suspect, and the possible delay in LeCouve's yelling for the dog to stop do not support such a conclusion either.

Gangstee's own witnesses declare that LeCouve did not give any commands to Dantes prior to his running after her; this fact undermines an inference of intentional deployment. Without some other affirmative act by LeCouve, the court is left to guesswork, insufficient to support a reasonable inference. *See Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 346 (9th Cir. 1978) (affirming grant of summary judgment for defendants where plaintiff's evidence, while "possibly" supporting a causation finding, could not support an inference in his favor because "[t]he verdict of a jury cannot rest on guess or speculation.").

On the record before the court, plaintiffs' Fourth Amendment claim cannot survive summary judgment.

B. Excessive Force, Monell Liability, and Inadequate Supervision

Plaintiffs' claims of excessive force, unconstitutional policies and procedures, and inadequate supervision all are premised on a violation of a constitutional right, relying upon a showing that Gangstee was seized to support the claims. *See* ECF No. 31 at 8. Because a reasonable fact-finder could not find an unlawful seizure, these other claims also cannot survive summary judgment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (no

constitutional violation can be found if there was no seizure); *cf. Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978) (governmental body could be liable for policies and procedures found to be responsible for an underlying constitutional violation by an employee); *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979) (supervisory personnel can be liable under § 1983 for the actions of their employees when a causal link between the supervisor and the claimed constitutional violation can be shown).

The court will GRANT defendants' motion for summary adjudication of claims one, two, three and four.

IV. Remaining State Law Claims

Subject to the conditions set forth in 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over state law claims. *See Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc). The court's decision whether to exercise supplemental jurisdiction should be informed by values of "economy, convenience, fairness, and comity." *Id*. at 1001 (citations omitted). Primary responsibility for developing and applying state law rests with the state courts. Therefore, when federal claims are eliminated before trial, district courts should usually decline to exercise supplemental jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Gini v. Las Vegas Metro. Police Dept.*, 40 F.3d 1041, 1046 (9th Cir. 1994) ("[I]n the usual case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state law claims.") (quoting *Schneider v. TRW Inc.*, 938 F.2d 986, 993 (9th Cir. 1991)). Although this case has been pending in this court for going on two years, the state law claims, with the exception of the eighth cause of action, have not been briefed or argued in this court. Sending the case to the state court, more familiar with the remaining claims, will promote judicial economy. In accordance with 28 U.S.C. § 1367(c), this court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. Accordingly, plaintiffs' claims five, six, seven and eight will be DISMISSED without prejudice.

V.  Plaintiffs' Motion for Summary Judgment

The court having declined to exercise jurisdiction over the remaining state law claims, plaintiffs' motion for summary judgment of their eighth cause of action for a violation of California Civil Code §3342 is DENIED without prejudice.

IT IS HEREBY ORDERED that:

1. Defendants' August 26, 2011, motion for summary judgment with respect to Plaintiffs' claims 1–4 (ECF No. 25) is GRANTED;
2. Plaintiffs' remaining claims 5–8 are DISMISSED without prejudice; and
3. Plaintiffs' August 31, 2011, motion for summary judgment (ECF No. 26) is DENIED without prejudice.

IT IS SO ORDERED.

DATED: January 11, 2012.

_____
UNITED STATES DISTRICT JUDGE

15